IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION


**ROBERT L. MATTHEWS,**

      **Petitioner,**

**vs.**

                                    **CASE NO. 4:09cv385-MP/WCS**

**KENNETH S. TUCKER, Secretary,**
**Florida Department of Corrections,[1]**

      **Respondent.**

_____/


## REPORT AND RECOMMENDATION

     This is an amended petition for writ of habeas corpus filed by Robert L. Matthews

pursuant to 28 U.S.C. § 2254.  Doc. 1.  Petitioner challenges his convictions for first

degree murder, armed robbery with a firearm, and grand theft of a motor vehicle, case

number 2004 CF 3398, in the Circuit Court of the Second Judicial Circuit, in and for

Leon County, Florida.  *Id.*  Respondent filed an answer, doc. 16, and the record in

electronic and paper form, doc. 17.  References herein to exhibits are to the record in

_____

     [1] On August 24, 2011, Kenneth S. Tucker succeeded Edwin G. Buss as the
Secretary of the Florida Department of Corrections, and is automatically substituted as
Respondent.  Fed.R.Civ.P. 25(d).

paper form.  Petitioner filed a traverse.  Doc. 25.   Respondent agrees that the petition

was timely filed.  Doc. 16, p. 3.

**Summary of the trial evidence**

The six person jury was selected on February 13, 2006, with the state waiving

the death penalty.  Ex. E (initial brief on appeal), p. 1.  The next morning, Officer

Causseaux saw Petitioner pass a note to a jail trustee with the intent that it be passed to

inmate Stanley Scott.  *Id.*  Casseaux intercepted the note.  *Id.*  Petitioner had written on

the note: "I have a juror that I did some time with.  He said he got my back.  Either not

guilty or mistrial."  *Id.*, p. 2.  Attention focused on juror Richard Ellsworth on the second

day of trial, who had previously been incarcerated in the Florida Department of

Corrections for about a year but his civil rights had been restored.  Ex. C (trial

transcript), p. 198.  There was no evidence that Ellsworth had visited Petitioner.  Ex. E,

p. 2.  Ellsworth said he had never been incarcerated with Petitioner and did not know

him.  *Id.*, p. 3.  The court excused juror Ellsworth, but specifically found that Ellsworth

had done nothing wrong.  *Id.*  The court dismissed Ellsworth because the evidence

which had been revealed to the court had been caused by Petitioner and had cast "a

doubt on the integrity of the process."  Ex. C, p. 196.

The trial evidence was that Petitioner and Corvin Harrison were in the drug

business together.  *Id.*, p. 4.  Patricia Parker was Harrison's girl friend.  *Id.*  On

September 25, 2004, Parker and Harrison traveled with Petitioner from Pensacola to

Tallahassee.  *Id.*  Harrison drove.  *Id.*  When they arrived in Tallahassee, Petitioner shot

Harrison, Parker fled, and Petitioner drove off.  *Id.*  Petitioner was arrested at his

residence with $1,295.00 in cash and Harrison's blood, as so identified by DNA, on his shoes. *Id.*, pp. 4-6.  The vehicle in which Petitioner drove away was later found on fire. *Id.*, p. 5.  A bag of clothing in a plastic bag smelling of gasoline was found in the garbage in a nearby gas station.  *Id.*  Harrison had been paid $1490.00 by his employer on the day of his death.  *Id.*, p. 6.  Petitioner's sister, Ola McGriff, testified that she and Petitioner drove around Leon and Wakulla Counties, dumped the vehicle and set it on fire, and disposed of the clothing in a dumpster.  *Id.*  Harrison had been shot in the head from a distance of about 6 inches with a .38 caliber hollow point.  *Id.*, pp. 6-7.

**Section 2254 Standard of Review**

The court may grant federal habeas corpus relief to "a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  A state prisoner must first present all federal claims in state court.  § 2254(b); O'Sullivan v. Boerckel, 526 U.S. 838, 839, 119 S.Ct. 1728, 1730, 144 L.Ed.2d 1 (1999). He "must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." 526 U.S. at 845, 119 S.Ct. at 1732.  The "one complete round" exhaustion requirement set forth in O'Sullivan v. Boerckel applies to post-conviction review as well, and a prisoner must appeal the denial of post-conviction relief in order to properly exhaust state remedies.  Leonard v. Wainwright, 601 F.2d 807, 808 (5th Cir.1979) ("In Florida, exhaustion usually requires not only the filing of a Rule 3.850 motion, but an appeal from its denial."); LeCroy v. Secretary, Florida Dept. of Corrections, 421 F.3d 1237,

1261 (11th Cir.2005), *cert. denied*, 546 U.S. 1219, 126 S.Ct. 1458, 164 L.Ed.2d 140

(2006) (as Florida prisoner failed to properly exhaust claim on direct appeal or Rule

3.850 appeal, it was procedurally barred, citing Coleman); Pope v. Rich, 358 F.3d 852,

854 (11th Cir.2004) ("*Boerckel* applies to the state collateral review process as well as

the direct appeal process").

      If a claim is not properly presented in state court and procedurally barred from

further state court review, a petitioner must demonstrate cause for the default and

actual prejudice, *or* demonstrate that the constitutional violation has probably resulted in

conviction of an innocent person.  Coleman v. Thompson, 501 U.S. 722, 750, 111 S.Ct.

2565, 115 L.Ed.2d 640 (1991); McCleskey v. Zant, 499 U.S. 467, 494-95, 111 S.Ct.

1454, 1470-71, 113 L.Ed.2d 517 (1991). On the other hand, a § 2254 petition "may be

denied on the merits, notwithstanding the failure of the applicant to exhaust the

remedies available in the courts of the State."  § 2254(b)(2).

      For a claim which has been properly exhausted and adjudicated on the merits in

state court, review is limited.  The state court's determination of a factual issue is

presumed correct, unless the petitioner can rebut the presumption by clear and

convincing evidence.  § 2254(e)(1).  If the petitioner failed to develop the factual basis

for a claim in state court, an evidentiary hearing in § 2254 proceedings is limited by §

2254(e)(2).  *See also* Cullen v. Pinholster, 131 S.Ct. 1388, 1398, 179 L.Ed.2d 557

(2011) (holding that review under § 2254(d)(1), addressed ahead, "is limited to the

record that was before the state court that adjudicated the claim on the merits," so the

federal court may not rely on new evidence developed in the § 2254 proceedings).

Further, the petitioner must show that the state court's adjudication of the claim:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

§ 2254(d).

Section 2254(d) is part of the basic structure of federal habeas jurisdiction, designed to confirm that state courts are the principal forum for asserting constitutional challenges to state convictions.  Under the exhaustion requirement, a habeas petitioner challenging a state conviction must first attempt to present his claim in state court.  28 U.S.C. § 2254(b). If the state court rejects the claim on procedural grounds, the claim is barred in federal court unless one of the exceptions to the doctrine of *Wainwright v. Sykes*, 433 U.S. 72, 82–84, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977), applies.[2]  And if the state court denies the claim on the merits, the claim is barred in federal court unless one of the exceptions to § 2254(d) set out in § § 2254(d)(1) and (2) applies.  Section 2254(d) thus complements the exhaustion requirement and the doctrine of procedural bar to ensure that state proceedings are the central process, not just a preliminary step for a later federal habeas proceeding, *see id.*, at 90, 97 S.Ct. 2497.

Harrington v. Richter, 562 U.S. __, 131 S.Ct. 770, 787, 178 L.Ed.2d 624 (2011).  If the

state court issues an opinion, it need not cite or even be aware of controlling Supreme

Court cases under § 2254(d).  *Id.*, 131 S.Ct. at 784 (citation omitted).  Further,

[w]here a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief.  This is so whether or not the state court reveals which of the elements in a multipart claim it found insufficient, for § 2254(d) applies when a "claim" not a component of one, has been adjudicated.

---

[2] To excuse a procedural default, as noted in Wainwright and the cases cited *supra*, a petitioner must demonstrate either cause and prejudice or actual, factual innocence.

*Id.*

For an ineffectiveness of counsel claim, the "clearly established" standard is set forth in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Under Strickland, "[a] convicted defendant making a claim of ineffective assistance of counsel must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment."  466 U.S. at 690, 104 S.Ct. at 2066.  In determining whether counsel gave adequate assistance, "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."  466 U.S. at 690, 104 S.Ct. at 2066.  Petitioner has a heavy burden, as he must show that "no competent counsel would have taken the action that his counsel did take."  Fugate, 261 F.3d at 1217 (citation omitted).  There are no rigid requirements or absolute duty to investigate a particular line of defense, and "more is not always better."  *Id.* (citations omitted).

Even if deficient performance is demonstrated, a petitioner must also show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  466 U.S. at 694, 104 S.Ct. at 2068. It must be "reasonably likely" the result would have been different; "[t]he likelihood of a different result must be substantial, not just conceivable."  Harrington, 131 S.Ct. at 793 (citations omitted).

While Strickland explained the performance and prejudice prongs of analysis, the court need not address them in that order or even address both, as failure to

demonstrate either step of Strickland is dispositive of the claim against the petitioner.

466 U.S. at 697, 104 S.Ct. at 2069.

> The Strickland standard itself is hard to satisfy, but:

> Establishing that a state court's application of *Strickland* was
> unreasonable under § 2254(d) *is all the more difficult*. The standards
> created by *Strickland* and § 2254(d) are both "highly deferential," and
> when the two apply in tandem, review is "doubly" so. The *Strickland*
> standard is a general one, so the range of reasonable applications is
> substantial. Federal habeas courts must guard against the danger of
> equating unreasonableness under *Strickland* with unreasonableness
> under § 2254(d). When § 2254(d) applies, the question is not whether
> counsel's actions were reasonable. *The question is whether there is any*
> *reasonable argument that counsel satisfied Strickland's deferential*
> *standard.*

Harrington, 131 S.Ct. at 788 (citations omitted, emphasis added).

**Legal analysis**

**Ground one**

Petitioner contends his trial attorney was ineffective because he left juror Thomas

on the jury. Doc. 6, p. 4. Petitioner alleges that juror Thomas's daughter worked for the

prosecutor and assisted the prosecutor in the courtroom during trial. *Id.*, pp. 4A-1, 4A-2.

Petitioner asserts that juror Thomas had a "vested interest" in seeing the state succeed

in his prosecution. *Id.*

During jury selection, Petitioner's attorney discovered that prospective juror

Thomas's daughter had just started work as a paralegal for the state attorney's office in

Tallahassee. Ex. D, p. 129 (doc. 17-9, p. 53 on ECF). The specific assistant state

attorney then present prosecuting the case was Frank Allman. *Id.*, p. 2 (doc. 17-8, p. 3

on ECF). Counsel for Petitioner assumed that Thomas's daughter worked in the office

but did not specifically work for Mr. Allman.  Ex. D, p. 129 (doc. 17-9, p. 53 on ECF).

Ms. Thomas said that her daughter did not live with her, and that her employment would

not affect her deliberations.  *Id.*, p. 130 (Doc. 17-9, p. 54 on ECF).  Petitioner's attorney

then said that he was satisfied with the six person jury, which included Thomas.  *Id.*, p.

140 (doc. 17-9, p. 64).  The court addressed Petitioner and reminded him that his

attorney still had four peremptory strikes that he could exercise and that Ms. Thomas's

daughter "worked in the State Attorney's Office."  *Id.*, p. 141 (doc. 17-9, p. 65 on ECF).

The court said:

> Now, it's totally a matter of strategy whether you want her kept on or off
> the case.  But do you understand that – you won't be able to argue later
> that, oh, gee, her daughter may have known something about this case,
> might have worked on it, or something?  Do you understand that?
>
> And you could use one of your peremptories or maybe even a cause
> challenge to strike number 1 [Thomas] if you wanted to. . . .  But I just
> need to be sure that this is not going to be an issue with you later.

*Id.*  Petitioner responded: "I'm not a lawyer."  *Id.*  The court commented that it had no

idea whether Ms. Thomas's daughter had worked on the case at all.  *Id.*, p. 142 (doc.

17-9, p. 66 on ECF).  Petitioner's attorney said that Ms. Thomas had said that her

daughter had just started.  *Id.*  The court asked the prosecutor, Mr. Allman, if he knew

"any personal exposure she might have had," and he said: "No, Judge, I don't know the

name, and I didn't know we hired paralegals."  *Id.*  The court said that it was "perfectly

happy to instruct Ms. Thomas . . . that she can't talk with her daughter . . . ."  *Id.*

Petitioner said he was satisfied with his attorney's decision.  *Id.*, pp. 142-143 (doc.17-9,

pp. 66-67 on ECF).  The court again reminded Petitioner that he was "not going to

complain about the decision later," and Petitioner said he did not have a problem with

Ms. Thomas staying on the jury.  *Id.*, p. 143 (doc. 17-9, p. 67 on ECF).

In his Rule 3.850 motion, Petitioner alleged for the first time that during jury

selection:

> Ms. Thomas even made a slight comment, saying, "there she goes right
> there" identifying her daughter in the first row of the audience, behind the
> prosecutor[']s desk.  And Mrs. Thomas's daughter (Roberta) did
> acknowledge her mother.  Although this slight comment was not caught by
> the court reporter, apparently.

Ex. J, R. 167 (doc. 17-12, p. 71 on ECF).  Petitioner then alleged:

> As the trial proceeded, the Defendant did see that Ms. Thomas's daughter
> had become an <u>intricate [sic, integral] member of the prosecutions team</u>.
>
> > 1.)   She did have a lap-top computer, and was passing
> >        papers back and forth to Mr. Allman for evaluation
> >        and strategy.
> >
> > 2.)   She also assisted in bringing forth the mannequin into
> >        the court room, as Mr. Allman had requested.

*Id.* (emphasis in the original).

The state court summarily denied grounds 1 and 3 through 13 of Petitioner's Rule

3.850 motion, including this claim raised as ground 1.  Ex. J, R. 167.  The court

reasoned that Petitioner had to prove actual bias against him and that his arguments

about Ms. Thomas's alleged bias were purely "speculative."  Ex. J, R. 168.  The court

noted that there were three prosecutors, Charles Goodwin, Robin Lotane, and Francis

Allman, none of whom were related to Ms. Thomas.  *Id.*  The court also recited the

extensive colloquy set forth above, when Ms. Thomas was seated without a peremptory

challenge, concluding that the record refuted Petitioner's claim that his attorney was ineffective for permitting Ms. Thomas to remain on the jury.  *Id.*, R. 169.

This was not an unreasonable application of <u>Strickland</u> on the record the state court had before it, and the state court did not need to hold an evidentiary hearing. Assuming that Petitioner's Rule 3.850 allegations were true, during jury selection Petitioner *heard* Ms. Thomas say "there she goes right now," saw her identify her daughter in the first row behind the prosecutor's desk, and saw Ms. Thomas's daughter acknowledge her mother, *all before* he decided to waive any claim that his attorney should have exercised a peremptory strike.  Mr. Allman had just said he did not know that his office had paralegals and he did not know Ms. Thomas's daughter, and yet, according to Petitioner, she was sitting right behind him and had been acknowledged by juror Thomas.  Petitioner himself had a chance to tell his lawyer, to point out Ms. Thomas's daughter, and to ask that there be further inquiry into what she did for the prosecutor, what she knew about Petitioner's case, and why she was there.  It would have been a simple thing then for his lawyer to have turned to Ms. Thomas's daughter and asked her what she did and why she was sitting behind the prosecutor.  Instead, Petitioner knowingly and intelligently waived any further argument that could be made about having Ms. Thomas on the jury.  His lead attorney, Frank Sheffield, can hardly be faulted for what Petitioner failed to tell him, assuming that this unlikely allegation is true.[3] Petitioner has not shown that the state court's rejection of this claim without an

---

[3] It is highly unlikely that the court reporter would fail to record Ms. Thomas's alleged comment, given that the issue under investigation was the relationship between the prosecutor and Ms. Thomas's daughter.

evidentiary hearing has "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or has "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  §§ 2254(d)(1) and (2).

**Ground two**

Petitioner contends his trial attorney was ineffective for failing to effectively cross-examine Patricia Parker, the "only eye witness" to the murder.  Doc. 6, p. 4.  He asserts that she should have been impeached for her prior inconsistent statements, about whether it was possible that "another assailant shot the victim from outside the car."  *Id.*, p. 4B-1.  He asserts that Parker had previously said that she did not see Petitioner with a gun, but said at trial that he had a gun.  *Id.*, p. 4B-2.  He also faults counsel for not impeaching Parker with her earlier statement that she was looking down at the time of the shooting, and may have been looking into her purse, thus making it impossible to see someone come up to the truck and shoot the victim.  *Id.*  Petitioner contends that the importance of this impeachment was that his defensive theory was that "they" owed money to a person in Pensacola, they had just returned from Pensacola "to leave the drug business," and the people to whom they owed the money had followed them to Tallahassee.  *Id.*, p. 4B-3.

Parker testified at trial that she, Petitioner, and the victim, Corvin Harrison, left Pensacola and drove to Tallahassee in a Ford Explorer.  Ex. C (trial transcript), pp. 61-64.  She said that Petitioner was siting in the back seat behind her, and Harrison was in

the driver's seat.  *Id.*, p. 70.  She testified that Harrison had over $1,000 with him.  *Id.*
She testified that when they got to Tallahassee and stopped, Harrison turned on the
dome light, pulled out his wallet, and she "turned to look outside, you know, to see, you
know, if anybody was walking up on the truck" because that is how Harrison had taught
her, and all of a sudden she heard a loud "pop."  *Id.*   Parker testified that Harrison was
dead, with blood running from his head.  *Id.*, p. 71.  Parker and Petitioner got out of the
truck, and she said that Petitioner had a gun in his hand.  *Id.*, p. 74.  She said that
Petitioner was "messing" with the gun, like he was having problems with it, and she ran
away.  *Id.*, pp. 74-75.  Parker said that she had seen Petitioner in possession of a
handgun at some time before, "outside of the house in the yard" in Pensacola.  *Id.*, p.
85.

In addition to this evidence, Petitioner's sister, Ola McGriff, testified that she
talked with Petitioner by telephone before the murder, and Petitioner said he was
"broke, and he didn't have a dime," and needed money.  *Id.*, pp. 311-312.  He told his
sister that when "the guy came home, he would have two or three thousand dollars, and
he [Petitioner] would be all right."  *Id.*, p. 313.  She admitted that she had previously said
that Petitioner told her that he "got rid" of the guy, and the less she knew about it, the
better.  *Id.*, pp. 314-315.  He told his sister that "the guy" was dead.  *Id.*, p. 303.  His
sister saw him driving the red Ford Explorer, and he said she did not want to know who
the owner was, that he had to get rid of it.  *Id.*, p. 291.  He said he planned to burn it.
*Id.*, p. 292.  She said that Petitioner retrieved a gas can from her back yard.  *Id.*

When he was arrested, Petitioner had $1,295 in cash.  *Id.*, p. 109.  The victim's body was dumped in the National Forest.  *Id.*, p. 108.  An expert testified that the victim was shot from 6 inches away.  *Id.*, p. 342.  He was shot in the back of the head at the base of his skull, through the occipital bone, and bullet fragments were found at the base of the victim's brain, in a "down to up" direction.  *Id.*, pp. 358, 362.

The trial court held an evidentiary hearing on June 12, 2008, as to ground 2 of the Rule 3.850 motion, the same claim presented here.  Ex. O, p. 2.  Mr. Sheffield testified that Petitioner, Parker, and Harrison had been selling cocaine and marijuana, and had left Pensacola owing someone money.  *Id.*, p. 10.  He said that at least according to Parker, Harrison was leaving the drug business.  *Id.*  He said that his defensive theory was that the people to whom money was owed followed Petitioner and the others to Tallahassee.  *Id.*  Sheffield said that Parker was either looking down or out of the passenger side window, and someone came up to the driver's side and shot Harrison and then left.  *Id.*  Sheffield said he found no advantage to pointing out that Parker had said she was looking down when the shot was fired, preferring to establish that she was looking out of the passenger window (away from the driver's side window), but whether she was looking down or out of the window did not matter to Sheffield.  *Id.*, pp. 10-11.  He explained that while Parker had testified that she had previously seen Petitioner with a dark gun, he thought that she meant another gun, not the silver one she earlier had said she saw in Petitioner's hand on the day of the shooting, and that in any event, his argument was that Petitioner had no gun on that day.  *Id.*, p. 13.  He did not think it was helpful to establish that she had seen Petitioner with a silver gun that

day.  *Id.*  He thought it more helpful to get her to talk as little as possible about the gun

at trial.[4]  *Id.*, p. 14.  He said that the expert had said that he could not determine the

trajectory of the bullet because the bullet had fragmented, and it was helpful to establish

that Harrison had his wallet out (rather than establish that Parker had earlier said he did

not have his wallet out) and had turned toward the back seat to give money to Petitioner

when someone shot him in the head through the driver's side window.  *Id.*, p. 14.  He

said it was unimportant to his defense as to when Petitioner got out of the car.  *Id.*, p.

15.  He explained that Parker was "all over the page" in prior statements about seeing a

gun, one time saying she did not, another time she did, and at one point implying that

Petitioner was about to shoot her, which Sheffield wanted to avoid presenting to the

jury.  *Id.*, p. 19.  He explained that Parker said she did not see the killing, and he

"certainly did not want to go in there and try to make her look like a liar when I was

depending on her testimony to support my theory."  *Id.*, p. 15.

The circuit court found the testimony of Mr. Sheffield to be credible, and

determined that his "explanation of his strategies are reasonable."  Ex. J, R. 233.  The

court said that the evidence against Petitioner was "overwhelming," and that part of that

evidence was that Petitioner "drove the truck in which the victim was shot, with the

victim's body in it, around to several places, and then attempted to burn the body and

the truck."  *Id.*  The court found Petitioner's criticisms of counsel's decisions were "nit-

picking."  *Id.*  The court said that even had counsel questioned Ms. Parker as Petitioner

---

[4] On cross examination, Sheffield established that Parker did not see Petitioner
shoot Harrison, and she did not see Petitioner pointing a gun in her direction.  Ex. C, p.
87.

claims that he should have, Petitioner had not shown that the result would have been

different.  The court said:

> Defendant's behavior after the shooting was rather insurmountable
> evidence implicating his guilt, especially with other forensic evidence that
> the gun was shot within 6-8 inches up to 1.5 to 3.5 feet of the victim's
> head, and the unrebutted evidence that the only people in the vehicle
> when the shot was fired were Ms. Parker, the victim, and the defendant.

*Id.*, R. 234.

This is a reasonable conclusion, based upon the weight of the evidence against

Petitioner.  There was no evidence that anyone saw anyone running away from the

driver's side of the car after the shot, and everything else pointed to Petitioner.  As will

be discussed ahead, the evidence that the killing was over a drug debt was flawed

because there was evidence that Petitioner had paid the debt, alleviating the concern

that a disgruntled drug dealer might harm Petitioner or Harrison.  Therefore, Petitioner

has not shown that the trial court's ruling as to this claim of ineffectiveness has "resulted

in a decision that was contrary to, or involved an unreasonable application of, clearly

established Federal law, as determined by the Supreme Court of the United States," or

has "resulted in a decision that was based on an unreasonable determination of the

facts in light of the evidence presented in the State court proceeding."  §§ 2254(d)(1)

and (2).

### Ground three

Petitioner contends his trial attorney was ineffective for failing to obtain an expert

to testify as to the effect that marijuana would have had on Parker's ability to perceive

and recall what happened after smoking "pot all day."  Doc. 6, p. 5 and 5A-1.  He

speculates that she would have suffered delirium, hallucination, disorientation, and amnesia, contrary to her testimony that marijuana calmed her down.  *Id.*, pp. 5A-1 to 5A-2.

Ground three was also summarily denied by the Rule 3.850 court.  Ex. J, R. 170. The court reasoned that the only evidence of marijuana use was that Parker said she, Petitioner, and the victim had smoked a "blunt" on the trip from Pensacola, but there was no evidence of how much Parker smoked or how long before the crime she had smoked it, and she had not been tested that night for a marijuana level.  *Id.*  Thus, said the court, a predicate for expert testimony was lacking.  *Id.*

Petitioner has not presented any evidence from an expert that sharing a single marijuana cigarette on a trip of several hours from Pensacola would have caused Parker to suffer delirium, hallucination, disorientation, and amnesia.  Thus, Petitioner has not shown that the trial court's ruling as to this claim of ineffectiveness has "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or has "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  §§ 2254(d)(1) and (2).

### Ground four

Petitioner contends that his attorney was ineffective for failing to call Harrison's mother as a witness.  Doc. 6, p. 5.  He contends that Harrison's mother would have testified that three men came to Harrison's house, looking for him, and that he was

afraid of them.  *Id.*, p. 5B-1.  He argues that this would have supported his theory of defense, that someone else shot Harrison.  *Id.*  Petitioner also contends that his attorney was ineffective for failing to ask "the only eye-witness" (Ms. Parker) "the appropriate question which would have substantiated a reasonable hypothesis of innocence."  *Id.*

This claim was raised as ground 5 in the Rule 3.850 motion.  Petitioner alleged that two days before the killing, three white men came to the home of Harrison's mother (Gwendolyn Tate) "asking where Corvin [Harrison] was (in an intimidating and angry demeanor, that indicated to her, that these men wanted to harm her son)."  Ex. J, R. 153.  He asserts that Parker and Harrison were both there.  *Id.*  He alleged that Ms. Tate and Parker told the men that Harrison was not there.  *Id.*, R. 154.  He asserts that when cross examining Parker, counsel asked Parker whether any people came to *Parker's* mother's home, which was the wrong question.  *Id.*

The trial court summarily denied this claim.  Ex. J, R. 172.  The court first held that Petitioner's "assumption that Ms. Tate would have testified that the men were intimidating and wanted to harm the victim is pure speculation."  *Id.*, R. 172.  The court noted that at sentencing, Ms. Tate testified that Petitioner had "viciously" murdered her son, that her "son's life was shortened due to [Defendant] not valuing the life of another or not just giving a damn," that Petitioner "committed a vicious and brutal murder by pointing a gun at the back of my son's head, pulling the trigger, and luring him to his

early death," and that Petitioner should spend the rest of his life in prison.[5]  *Id.*, R. 173.

The court reasoned that given her sentencing testimony, Ms. Tate would not have been

a favorable witness as alleged.  *Id.*

The court also noted the jury was informed that Harrison and Petitioner were

drug dealers and they were concerned because they owed money to someone.  Ex. J,

R. 172, citing pages 87-88 of the transcript.  Counsel established from Parker that

Harrison and Petitioner were drug dealers and that on the day of the murder, she found

out that Harrison and Petitioner were concerned about owing somebody for drugs.  Ex.

C, pp. 87-88.

The state court pointed out that Petitioner's sister, Ms. McGriff, testified that

Petitioner claimed that people were following them the night of the killing.  *Id.*, R. 172,

citing page 324 of the transcript.  That is in the transcript, but the court did not permit

counsel to ask who Petitioner had said were following them, or why.  Ex. C, p. 334.

The jury was then excused, and Ola McGriff testified in voir dire that, before "all

this other stuff" happened, Petitioner called her and told her that "some guys was trying

to kill them [Petitioner and Harrison], that he paid the guys off, and that he thought

everything was going to be all right."  *Id.*, p. 327.  She further explained:

> [Petitioner] said the deal had went wrong and the guys was trying to kill
> them because the other guy, I guess it was Corvin [Harrison], whatever his
> name was, had messed the money up and that he had to pay the guys off
> to stop them from killing him.  And he believed they were trying to kill both
> of them.

---

[5] These findings as to Ms. Tate's sentencing testimony are fully supported by the
transcript.  Ex. C, pp. 517-518.

*Id.*, pp. 327-328.  The trial court ruled that Petitioner's attorney *would* be allowed to pursue these questions, but that the state would be allowed to "get the rest of the statement out."  *Id.*, p. 328.  A recess occurred so that Petitioner and his lawyer could confer to see what they wished to do.  *Id.*  When the jury came back in, Petitioner's assistant attorney, Ms. Dandelake, withdrew the question.  *Id.*, p. 329.

At the end of the trial, the court returned to this issue and reminded Petitioner that he had been permitted to elicit the additional evidence, but that the whole statement would come out, including the part that the debt had been "paid off and taken care of."  *Id.*, p. 598.  The trial court asked counsel if Petitioner had agreed with the strategic decision not to pursue this evidence.  *Id.*, p. 599.  Counsel said yes, explaining that she and Mr. Sheffield had spoken to Petitioner about the "pros and cons," that Petitioner agree not to pursue it.  *Id.*  Petitioner then acknowledged that not pursuing this line of questioning was his decision.  *Id.*

The Rule 3.850 court concluded that Ms. Tate's testimony would have been cumulative, and that the jury already had evidence that perhaps a disgruntled drug dealer had shot Harrison and had rejected that theory.  Ex. J, R. 172.  This is not an unreasonable application of <u>Strickland</u>.  There is no affidavit from Ms. Tate as to what she might have said, and it was not unreasonable to conclude from her testimony at sentencing that she would not have been at all helpful at trial.  Further, as Respondent points out, had Petitioner been permitted to put on this evidence, the trial court probably would have permitted the recall of McGriff to testify that Petitioner himself said that the debt to the disgruntled drug dealers had been paid.  Ground four affords no relief.

**Ground five**

In ground five, Petitioner faults his attorney for failing to establish with testimony from Ms. McGriff that Petitioner had told her who had been following him, and why. Doc. 6, p. 5E-1.

The Rule 3.850 court found that the record "conclusively refutes" this claim.  Ex. J, R. 173.  It does.  Petitioner's attorney made a strategic choice to avoid this evidence because it would have established that the debt (if there was one) had been paid, and Petitioner told the trial court he agreed with that strategy.  It was plainly a sound strategy because evidence that the debt had been paid would have seriously undercut the suggestion that Harrison was murdered by "disgruntled drug dealers."

**Ground six**

Petitioner contends that the trial court erred when it dismissed a juror (Richard Ellsworth) who was able to continue as a juror and was not disqualified.  Doc. 6, p. 5F-1.  As noted earlier, this issue occurred because Petitioner passed a note in jail asserting that a juror on his jury would vote for acquittal or mistrial because he had been incarcerated with the juror.  The only juror who had been incarcerated was Ellsworth. The trial court ruled that the juror had done nothing wrong, but dismissed the juror to maintain the court's integrity.

This issue was raised on direct appeal entirely as a state law question.  Ex. E, pp. 10-14.  Petitioner has not shown cause for his procedural default, or prejudice to the outcome.

Despite the procedural default, the claim should be rejected on the merits as permitted by § 2254(b)(2).  "The Sixth Amendment, made applicable to the states through the Fourteenth Amendment's Due Process Clause, protects a criminal defendant's right to a fair trial by a panel of *impartial* jurors."  <u>Ward v. Hall</u>, 592 F.3d 1144, 1175 (11th Cir.), *cert. denied*, 131 S.Ct. 647 (2010) (emphasis added).  The federal constitution does not regulate the procedure by which a state court selects among several impartial jurors, and a defendant has no right to a *particular* impartial person on his or her jury.  The parties to a criminal trial have no "proprietorship in the several members of the panel."  <u>Schwartzberg v. United States</u>, 241 F. 348, 351  (2nd Cir. 1917).   For example, "[t]he right of peremptory challenge is not of itself a right to select, but a right to reject jurors."  <u>United States v. Marchant</u>, 25 U.S. 480, 482, 6 L.Ed 700, 12 Wheat. 480  (1827); <u>Pointer v. United States</u>, 151 U.S. 396, 412, 14 S.Ct. 410, 416, 38 L.Ed. 208 (1894).  Thus, even if qualified and impartial, "the defendant does not have the right to place on the jury those whom the prosecution has challenged peremptorily."  <u>Shaw v. United States</u>, 403 F.2d 528, 530 (8th Cir.1968).  In <u>United States v. Shiomos</u>, 864 F.2d 16 (3rd Cir. 1988), the court held that a decision to sequester a jury, a decision which rendered some qualified jurors unable to sit, did not violate the constitution:

> Although the jury composition was presumably different than it would have been had there been no sequestration, the Supreme Court recently held that when the jury composition is challenged, *there is no reversible error unless there is some showing that the panel chosen was in some way not impartial.*  <u>Ross v. Oklahoma</u>, 487 U.S. 81, 108 S.Ct. 2273, 2277, 101 L.Ed.2d 80 (1988).

<u>United States v. Shiomos</u>, 864 F.2d 16, 19 (3rd Cir. 1988) (emphasis added).

While juror Ellsworth had done nothing wrong, an appearance of impropriety nonetheless remained and Petitioner had caused that appearance of impropriety himself.  The state court plainly had authority to protect the integrity of the jury.  Ground six is without merit.

**Certificate of Appealability**

Section 2254 Rule 11(a) provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and if a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)."  A timely notice of appeal must still be filed, even if the court issues a certificate of appealability.  § 2254 Rule 11(b).

I find no substantial showing of the denial of a constitutional right.  § 2253(c)(2); Slack v. McDaniel, 529 U.S. 473, 483-84, 120 S.Ct. 1595, 1603-04, 146 L.Ed.2d 542 (2000) (explaining how to satisfy this showing) (citation omitted).  Therefore, I recommend that the court deny a certificate of appealability in its final order.

The second sentence of Rule 11(a) provides:  "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue."  The parties shall make any argument as to whether a certificate should issue by objections to this report and recommendation.

**Conclusion**

Accordingly, it is **RECOMMENDED** that petition for writ of habeas corpus filed by Robert L. Matthews pursuant to 28 U.S.C. § 2254, challenging  his convictions for first degree murder, armed robbery with a firearm, and grand theft of a motor vehicle, case number 2004 CF 3398, in the Circuit Court of the Second Judicial Circuit, in and for Leon County, Florida, be **DENIED WITH PREJUDICE**, and that a certificate of appealability be **DENIED** pursuant to § 2254 Rule 11(a).

**IN CHAMBERS** at Tallahassee, Florida, on January 4, 2012.


**s/    William C. Sherrill, Jr.**
**WILLIAM C. SHERRILL, JR.**
**UNITED STATES MAGISTRATE JUDGE**


**NOTICE TO THE PARTIES**

**A party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 14 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**